David O. Boehm, J.
The defendant was convicted on December 10, 1968, after a jury trial, of the crime of inciting to riot in violation of section 240.08 of the Penal Law of the State of New York. The evidence submitted 'by both the People and the defense shows that on the evening of October 11,1968, during a concert given by the singer, Aretha Franklin, at the Rochester War Memorial, a scuffle broke out between a member of the. audience and a security guard inside the auditorium. Four or five security officers intervened and took the man inside a room to the right of the stage. A crowd collected and a young man said, “ They are going to kill him, they are going to kill him. They can’t kill my brother.” A group of friends gathered at the auditorium door and someone remarked, “Let’s break in there.” By the time the concert ended, about 11:00 p.m., a mob of people had collected at the Broad Street entrance trying to get inside. Unable to 'get in, the mob moved to Exchange Street to try to force its way in through the front entrance. In the *151 meantime,, the police had been called. Two units were dispatched, but five minutes later a call was made for all available units because of the badly deteriorating situation. On his arrival, police officer Accorso, the sole witness for the People, found the outside upper level plaza on Exchange Street ‘ ‘ completely saturated with people.” Four police officers went inside the lobby to get the people out of the auditorium and officer Accorso remained outside to move the crowd of almost 150 to 200 people. There was considerable tumult. The crowd, was noisy and shouting; beer bottles and rocks were thrown. Some police officers were struck by flying missiles and required hospital emergency treatment. A surging group of 15 to 20, people, led by the defendant, was trying to push and force its way inside and spat at the door. Some gained access and fought with the police officers inside who were struggling to close the doors. Three times the defendant and his group were asked by officer Accorso to leave, but the defendant continued to urge the crowd on, shouting: “ You have no right to keep us out of here. We have all the right to stay in there, we paid our fare ’ ’ (which the defendant, by his own admission, had not paid). “ These cops can’t get away with what they are doing. 1 will move when I’m ready.” Upon observing some police officers making an arrest, the defendant and others in his group called out, “ They can’t get away with that. If we had guns we would break it up. They wouldn’t do that if we had guns.” When the police asked him to move on, he answered, “ We ain’t going no place” and urged the people not to leave, shouting,‘‘ Stay right here. They can’t make us move. ’ ’
The defendant was finally arrested by officer Accorso at 11:45 p.m., approximately one-half hour after the police arrived. The record is totally free of anything which would indicate that the police, by their words or conduct, did anything to provoke the crowd or ignite an already explosive situation. They acted moderately and with restraint. They reassured the boy whose brother had been involved with the security officers inside.
The defendant denied urging the crowd to stay or to force the doors. On the contrary, he testified that he told the crowd to go home before something happened. “ I was on the sidewalk in front of the steps ’ ’, he testified. 11 It was sort of like a separation. The people had the sidewalk. To the left there was a .crowd, to the right there was a crowd. The largest crowd was on the right side of the sidewalk. I came down the steps; therefore I was on the right. The police kept telling them to back up, back up. They they were forced back. Then they *152 turned their attention to the left side of the sidewalk and then would come up again. I told them all, 1 You might as well go home, nothing’s going to happen. All you will do is get yourselves in trouble.’ ” (Emphasis supplied.)
However, the jury, under a proper charge from the court, resolved the fact question against the defendant by its verdict of guilty.
The defendant in this appeal raises the following argument for reversal: (1) that the People failed to prove a prima facie case; (2) that the verdict was against the weight of evidence; (3) that the statute under which the defendant was convicted is unconstitutional in that it violates the First Amendment to the United States Constitution; and (4) that cumulative errors require reversal.
In each of the defendant’s arguments, the court finds no merit and therefore affirms defendant’s conviction.
Section 240.08 of the New York State Penal Law reads as follows: “ A person is guilty of inciting to riot when he urges ten or more persons to engage in tumultuous and violent conduct of a kind likely to create public alarm. ’ ’
This section was designed to penalize those who urge riotous conduct, without the necessity of proving a consummated riot or an agreement to riot by persons assembled with the accused. The Practice Commentary to this section in McKinney’s Consolidated Laws of New York (Book 39,, Penal Law, pp. 121AL22) discusses the conduct intended to be covered. ‘ ‘ This crime, which is new, covers conduct in the riot area which does not amount to either the crime of riot or the crime of unlawful assembly. A rabble rouser who urges a group of twenty people to go out and break windows in a Negro neighborhood and acquires the acquiescence of at least four of them is guilty of unlawful assembly even if the project does not materialize (’§ 240.10; see former Penal Law §§ 2092, 2094). In the absence of such approval or cooperation, however, he is not guilty of unlawful assembly, for he has not assembled with four or more other persons' for the pre-conceived or agreed purpose of engaging in riotous conduct (§ 240.10). The instant section fills the indicated gap with the crime of ‘ inciting to riot’.”
The question presented, therefore, is whether the defendant’s acts and words in such volatile and combustible circumstances can reasonably be interpreted as urging riotous conduct. Riotous conduct is defined by sections- 240.05 and 240.06 of the Penal Law as “ tumultuous and violent conduct ” creating “ a grave risk of causing public alarm ’ ’.
*153 The same Practice Commentary, (pp. 118-119), discussing the purpose of these two sections defining the different degrees of riot, sheds further light upon the intention of the Legislature, pointing out: “ The phrase ‘ tumultuous and violent conduct ’, however, in itself clearly means much more than mere loud noise or disturbance. It is designed to connote frightening mob behavior involving ominous threats of injury, stone throwing or other such terrorizing acts.” (Of. American Law Institute, Model Penal Code, Tent. Draft No. 13, § 250.1.)
The defendant’s words and conduct obviously amounted to more than just loud or even agitated conversation. They were clearly designed to further incite an already turbulent crowd, and to effect a re-entry into the War Memorial by physically overwhelming the outnumbered police. Had they been overrun, the consequences to the security guards inside may have been bloody and brutal. No other reasonable interpretation can be made of the defendant’s purpose, especially in view of the proof that, at the same time, rocks and bottles were being hurled.
The defendant’s conduct was at least as serious as the conduct interdicted in People v. Ascher (57 Misc 2d 249), where the court found that the defendant’s activity was designed to aid an anti-Vietnam demonstration by disrupting traffic and generating confusion and disorder in a much traveled thoroughfare in New York City, and upheld an information accusing the defendant of inciting to riot.
Regarding the instant case, this court finds that the People presented a prima facie case which, if believed by the jury, would warrant the defendant’s conviction.
With respect to defendant’s second argument that the verdict was against the weight of the evidence, it is clear from reading the record that the witnesses called by the defense were either character witnesses not present at the War Memorial on October 11, 1968 or persons who, by their own admissions, were not in the company of the defendant during the crucial time it was alleged the defendant committed1 the crime for which he was convicted.
The defendant next contends that section 240.08 of the Penal Law is unconstitutional in that it infringes upon the fundamental right of freedom of speech. However, the statute in question does not unconstitutionally impinge upon First Amendment rights. It is designed to prevent the very violence which was intended by this defendant and which would have probably erupted if the police had not dampened the fuse by placing him .under arrest. Its lawful purpose is to prevent the out *154 break of violence by discouraging such language and conduct as can be reasonably anticipated would cause civil disorder. (Cf. People v. Radich, 26 N Y 2d 114.)
The reasoning of Judge Basel upholding the statute as constitutional in People v. Ascher (supra), is persuasive and compelling. His review of the common-law history and the numerous authorities he cites satisfies this court of the constitutionality of section '240.08 as well as of its constitutional application in this case. (See, also, People v. Feiner, 300 N. Y. 391, affd. 340 U. S. 315; People v. Turner, 48 Misc 2d 611, affd. 17 N Y 2d 829, remittitur amd. 18 N Y 2d 683, cert. granted 385 U. S. 917, cert. dsmd. 386 U. S. 773; People v. Hussock, 6 Misc 2d 182, cert. den. 312 U. S. 659.)
No one would deny that the police have the constitutional authority to disperse a crowd even if the question of a violation is itself determined by the police. (People v. Hussock, supra; People v. Galpern, 259 N. Y. 279; People v. Friedman, 6 Misc 2d 271.)
Whether under the 'guise of social protest or the claim of any other First Amendment right, the use of the streets and speech therein are not wholly unrestricted.
“The rights of free speech and assembly,” declared the United States Supreme Court in Cox v. Louisiana (379 U. S. 536, 554), “while fundamental in our democratic society,, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time. The constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy.”
Speech which incites to unlawful action falls outside the protection of the First Amendment where there is a direct connection between the speech and violation of the law. This is the “ clear and present danger test ” first enunciated in 1919 by Justice Holmes in Schenck v. United States (249 U. S. 47, 52). Speaking for a unanimous court, he rejected the absolutist view of First Amendment rights, stating (p. 52): “But the character of every act depends upon the circumstances in which it is done [citation]. The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic * * *. The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree.” *155 ([Emphasis supplied]; see, also, Adderley v. Florida, 386 U. S. 39.)
In 1941, the United States Supreme Court upheld a law requiring a permit to hold a parade or procession. It said: ‘ ‘ Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses. The authority of a municipality to impose regulations in order to assure the safety and convenience of the people in the use of public highways has never been regarded as inconsistent with civil liberties but rather as one of the means of safeguarding the good order upon which they ultimately depend.” (Cox v. Few Hampshire, 312 U. S. 569, 574.)
Always provided that the government administers its power with an equal hand, it has the right to impose reasonable restraints .upon speech in public places. And as has been constantly recognized and repeatedly pointed out, “When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the State to prevent or punish is obvious.” (Cantwell v. Connecticut, 310 U. S. 296, 308.)
Probably the most eloquent and convincing reasons for the power of the State to impose reasonable restraints have been expressed by two liberal members of the high court, albeit in dissenting opinion; one by Justice Jacksox in Terminiello v. Chicago (337 U. S. 1, 13-37), the other by Justice Black in Cox v. Louisiana (379 U. S. 536, 583-584), wherein he cautioned: “ The streets are not now and never have been the proper place to administer justice. Use of the streets for such purposes has always proved disastrous to individual liberty in the long run, whatever fleeting benefits may have appeared to have been achieved. And minority groups, I venture to suggest, are the ones who always have suffered and always will .suffer most when street multitudes are allowed to substitute their pressures for the less glamorous but more dependable and temperate processes of the law. Experience demonstrates that it is not a far step from what to many seems the earnest, honest, patriotic, kind-spirited multitude of today, to the fanatical,, threatening, lawless mob of tomorrow.”
It is apparent that “legislative intervention” with respect to the statute here under attack was lawful and appropriate. Its purpose, as weE as its effect here, is to deal with the abuse of First Amendment rights, not to curtail them. (De Jonge v. *156 Oregon, 299 U. S. 353, 364-365.) “ The choice is not between order and liberty. It is between liberty with order and anarchy without either.” (Termmiello v. Chicago, dissent, Jackson, J., 337 U. S. 1, 37.)
The limitations imposed upon the defendant in this case in the circumstances found to have existed by the jury, and the rights which he claims are here being infringed, have been distinguished by one writer as the difference between “ speech pure ” and “ speech plus”.
“ The distinction between speech pure and speech plus — between speech alone and speech that is not verbal expression alone but blended together with a course of non-verbal conduct— is one that is of help in resolving one of the key current problems in First Amendment jurisprudence * * * Though pure speech is subject to relatively little governmental interference * * * the same is not true where speech is combined with conduct which may involve coercion, injury to property, and even violence. Government may restrain such conduct, and the circumstance that such restraint may have an impact upon speech, or otherwise permissible expression, does not make it invalid. In the case of acts which are more conduct than speech, the restraints imposed are primarily upon people doing something, not on their saymg something.” ('Schwartz,, A Commentary on the Constitution of the United States, part III, vol. I, pp. 394, 395-396,, [emphasis in original].)
The fact that the statute makes no reference to “ intent ” or to a “ clear and .present danger ” does not doom it as unconstitutional. While mindful of the necessity of these two elements: before one’s freedom of speech may be abridged, it is sufficient that this court interpret the statute as requiring these elements, in accordance with sound constitutional principles so as to¡ preserve its constitutionality. (People v. Epton, 19 N Y 2d 496.)
From the record before us the jury was justified in finding from the defendant’s language and conduct that he intended to urge others to engage in tumultuous and violent conduct of a Idnd likely to create public alarm and disorder. From the record it is equally clear that such conduct represented a “ clear and present danger.”
Lastly, the defendant urges that in the instant record there appears an accumulation of errors which require reversal. He cites the use of leading questions by the District Attorney and the failure to comply with section 813-f of the Code of Criminal Procedure as examples. The court notes the lack of objection by defense counsel thereto. In the absence of a claim of incom *157 petence of counsel, the oases of People v. Ross (21 N Y 2d 258) and People v. De Renzzio (19 N Y 2d 45) are dispositive of this issue, particularly since we hold the section attacked to be constitutional.
The judgment of the City Court of Rochester convicting the defendant of the crime of inciting to riot in violation of section 240.08 is affirmed.